LLC. Mr. Fraser. Good morning. I may have pleased the court. The Texas Oil Field Anti-Indemnity Act, which creates a comprehensible and workable framework for operators, contractors, and others in the oil and gas industry to enter into enforceable indemnity obligations when they are, when they agree to support those obligations with insurance. The district court's judgment upends this framework and controlling jurisprudence and should be reversed for the following reasons. By conducting a coverage analysis of CP Well's umbrella policy, which was there to provide insurance for these obligations, the district court misapplied the provisions and defeated the Purpose Atollia, which sets the mutually procured limits or amounts of insurance as the lowest limits that the parties agree. It ignored provisions of the Master Service Agreement, the MSA, and it violated the Texas Supreme Court's decision in Kim Petroleum and its progeny, which looks only to the limits of insurance to make these determinations. Is the safe harbor provision of the act met? And what is the mutually agreed limits? They do that, the state courts do that and did that, and Kim Petroleum, excuse me, did that without looking at and diving in behind and looking into the definitions, instructions, provisions, limitations, exclusions of policies. And lastly, and equally as importantly, Your Disruption, because there are many operators and contractors that have the minimum amount, the floor of limits that they are required, above which they are required to have insurance, they're not going to know if they're adequately protected or if they're protected at all. And so for these reasons, the courts should reverse and find in their declaration that T.P. Wells' policy or his insurance are the limits, the $1 million primary and the $10 million excess umbrella policy. Now, here's why the court misapplies the act. And I know the court has this probably in other sources, but I provide the court with just some excerpts for the court's convenience. It's tab one, exhibit one of the bench exhibits. And 127.05 is the key provision. And this is where we look. And it's exhibit one. It's only one page. I don't think you need to quote the Indemnity Act. We know the Indemnity Act and we know what Kim Petroleum requires. Yes, Your Honor. And the focus, though, and I agree, I'm not looks like the indemnity obligation is limited to the extent of the coverages and dollar limits of insurance. But counsel, doesn't that just mean the parties are free to contract for whatever limits they they seek to enter into? Well, yes, that's the purpose of the act. And that happens. That happened here with the floor, as you said. I mean, it was, I guess, one million plus two million was the minimum. It says the floor. But the parties, Your Honor, in the MSA. But then what? Give me a case that says it was wrong for the district court to go to the insurance policy CP Well had to determine how much coverage CP Well had for the benefit of Cimarrax. That's just the point, Your Honor. No court has done that. Now, have they done that? But Kim Petroleum doesn't say that, right? Kim Petroleum just says it's to the extent that both parties had coverage. But what Kim Petroleum did, the court did, is it looked in the agreement. The agreement did not provide any amount by one of the parties. It provided 16 million for one party. What did they, what did the court do? It looked to see what amount of insurance, not by a coverage analysis, Judge the limits. What are the limits of the policy? And it turned out to be 16 million. But it wasn't in the agreement. In the case, that's why this Kim Petroleum is applicable here, because, as a district court did correctly find, it made several correct findings. That just set the floor. Yes, the parties were agreed to go above the floor. Now, the floor for Cimarrax was 1,025,000,000. And so, its policies have 1,025,000,000. No one's talking about saying, well, is it really 25 million? Let's look around. Now, we don't, and we have the floor. But did that, did that, did that require C.P. Will, by inference, to get 25 million, a matching amount? I mean, is that what your position is, that the amounts? No. And that's what Kim Petroleum held, that the jurisprudence that it examined, misapplied, or at least maybe toyed at the time, said that it had to be in equal amounts. And Kim Petroleum said, no, it doesn't have to be in equal amounts. And that's why the act is important, because it talks about the dollar limits agreed to obtain. And so, what Kim Petroleum held is that it's okay, one, if the amounts are not in the agreement. Two, it's okay if they're different. Now, they happen to be the same. Well, let me ask you, though. Aren't you using the master service agreement to modify the terms of the excess policy? No, Your Honor. Here's why. When the cases that deal with an indemnity claim, they look to the contract. The contract governs. They look to the contract, and what does the contract say? It talks about the amounts to agree or to provide, but there's a difference between coverages, bodily injury, property damage, pollution, or coverages. I understand that, but the insurance contract that they actually procured says, depending on how you define insured contract, it says you're only insured up to the minimum stated in that MSA. Okay. That is subsection E, which is in the Exhibit 3. And I will address subsection E, and I can do it now. Okay. Well, I don't want to interrupt your proposal. No, no. I will as to why that doesn't apply. But I think what's important is what the overarching argument is, this court or the district court erred by conducting a coverage analysis of the umbrella policy to determine what the MSA says. But how is that a coverage analysis? I mean, the insurance contract, as referenced by the MSA, right? Well, that's what it thought it was doing, was looking at subsection E, but it did look at and determine what that meant and what was covered and what amounts are not covered. Here's the issue, though. The issue is the policies do cover contractual liability, but the MSA creates two types of relationships. And what's key is if you look at the third page of Exhibit 2, you'll see that general insurance requirements, that CPOL was required to have CIMERECS named as a named insured, additional insured, excuse me, additional insured to its policy. Then you have the indemnity obligation. So you have an obligation to indemnify and you have an obligation to name as additional insured. This court has held in the Gulbang case and there are other cases that squarely held Deepwater Horizon from the Texas Supreme Court 2015. Those are two separate and distinct obligations. I wouldn't disagree with that, but it depends on the terms of the contract, does it not? And here, the indemnity clause, clause 11, speaks about contractors' duty to indemnify without respect to fault. True. Regardless of fault. And then it says an additional insured, all policies, you know, for whatever coverage, including comprehensive general liability, well, CGL is without respect to fault, is it not? It generally is, but... So what's the, I mean, so functional, and then both of these clauses, I mean, I agree the indemnity obligation was that, is without limit. But since we have, since the scope of coverage of these is the same, they were required to purchase insurance to the same amount in the indemnity and the additional assured clauses. And we may be bound, I'm not saying we are, because this is difficult for me, by the Deepwater and language, you have to go back to the policy. This is, I understand the court's statement. This is different. First of all, there are claims that Semerex could have brought as an additional insured that are, that would not involve the indemnity obligation. So, Your Honor, they're not exactly the same. They're just not. An example is, Semerex can make a claim against AIG as an additional insured that it would have if it involves injury to a Semerex subcontractor's employee. That's a, you know, that's not inside the indemnity obligation. And so, that's one example. Those cases, Your Honor, that go into the I'm an additional insured and here's the coverage. I want coverage against you, AIG. I want money from you. It didn't. It sued CPOL as the indemnitor to Semerex the indemnity. It's a different relationship, different obligations, and it's a different path where you get to. And when you have an indemnity claim, you look at the terms of the MSA here in terms of the statute and see what they agreed to. Now, the argument that you'll hear my friend make is that, well, the minimum limits is what we agreed to. Well, the district court didn't hold that. But on Section 1110, Your Honor, if you'll indulge me, there are, in that section, if you go down the fourth line, it talks about with minimum limits and coverages, not less than. You go down to the bold about the TOIA provision of the types and in the amounts, not less than those specified. But counsel, how does that? I mean, you just left the the there was no agreement about the amount to be covered or carried then. In other words, how is the minimum not also the agreement here by that language? Because it just sets the floor. Then what is the agreement? The agreement is what they obtained. The courts say that you look to what they obtained as where does it say in the MSA that the amount that both the parties obtained are automatically for the benefit of the other party? Well, the umbrella policy of CP well as the primary policy. So we go to that policy, but we don't go to the well. Well, it's it's the policy that was brought. What they had to have insurance. And so do they have insurance? They did. Right. And it met the minimums in the MSA. Well, they agreed to procure insurance. But Ken Petroleum says in its progeny that, you know, you look at what are the limits. You don't do a coverage analysis to determine what if there's an exclusion buried there. That was umbrella insurance that was there that was available for the indemnity obligations. But we're not you and CP well free to get whatever insurance in excess of that minimum that you thought was prudent. Yes. And the issue is that they obtained. They were free. But if I may, I got 30 seconds and I'll defer to your questions, obviously. But I will say this. There is no operator or contractor in the oil patch that will make this argument because by making this argument and by agreeing with the district court, CP well is forfeiting, is giving up, is letting go of eight million dollars of indemnity money that it could have because now it's three million. We've got 26. It doesn't matter. We only pay three. If the shoes on the other foot, they only May it please the court. Good morning. I'm Ellen Van Meer and I'm here representing Appley CP well testing. CP wells testing, I'm sorry, CP wells position and arguments in this case are about its indemnity exposure consistent with Texas law and its public policy to the agreed upon three million dollars supported by liability insurance. Speak up a little bit, please. Sure. Texas law, under Texas law, indemnity provisions are disfavored and specifically oil and gas indemnity provisions are strictly restricted. They're viewed skeptically. We know this from the fair notice and express negligence rules in dresser industries. That's totally irrelevant to this case. This is a master servant. It's very, it's right at the top of the agreement there and strict Tissima Uri and so on. Uri's, uh, Ken's petroleum took, uh, uh, one side of the indemnity that had zero insurance and said it's six ought or gray wolf, whichever it was. So that's not strict Tissima Uri's in my views. It depends on what the contract is and they have to be equal coverage to be mutual indemnity. Uh, I agree, your honor, and I agree to the extent that CP well has actually indemnified Cimerex to $3 million. It's not breached its contract. It's indemnified and paid $3 million, uh, to resolve the claims against, by Johnny Trent, uh, for an accident on Cimerex property as with Cimerex as the operator. Uh, the question here is what did CP well agree to? When you look at the Texas Oilfield Anti-Indemnity Act, sometimes I'll refer to it as TOIA. Um, when you look at that act specifically in the act, your honor, it disfavors indemnity agreements. It specifies they are against public policy. We understand that and Judge Owen wrote Ken's petroleum and you don't need to, uh, you know, educate us about the purposes and policies of TOIA. Get to the contract and policy at issue, please. Yes, your honor. Absolutely. The agreement in this case required $3 million of insurance to support the mutual indemnities between the parties. Um, CP well didn't agree to furnish any more than $3 million. But, but you did and so does Ken Petroleum require that the match, I mean, as council opposite, I guess, position is, it's 11 million and 11 million. The question under section 127.005 specifically, it's in there, is what did the parties agree to furnish for the benefit of the other? What CP well agreed to furnish was $3 million of insurance. A minimum of. Absolutely. It's a floor. They absolutely agreed to provide a minimum of $3 million of insurance. Could it be read that the agreement was to provide at least three, but whatever else we provide is subject to the indemnity provisions? You absolutely could agree to that. If you look at the neighbors. But did you hear? I mean, by the language of the MSA. We did not. CP well did not agree to anything other than providing $3 million. Neighbors. Then what does the at least mean? At least means that you agree. At least means emphatically no less than $3 million. Exactly. And we provided no less than $3 million. But you say not a penny more. So why put in at least? Well, when CIMREX drafted this agreement, they could have said, as they did in neighbors, the case also evaluating the Texas Oilfield Anti-Indemnity Act. As an example, they could have said, we'll take the maximum of whatever insurance the parties agreed to get. What does at least mean? At least means no less than. Okay. And no less than means. That doesn't mean that we haven't agreed that we won't provide more. It doesn't. Well, now it's difficult for me to speak in all the negatives. It did not agree to provide more. It didn't agree not to provide more. Then it should have said, we agree to provide $3 million. My position is it did say, we agree to provide $3 million. We agree to provide a minimum of $3 million. At least $3 million. It doesn't foreclose the possibility that they agreed to provide more. If there was evidence that CP Well agreed to provide more, if there's actual evidence of an agreement. There is, because they did provide more. That's not evidence of an agreement. That's evidence that CP Well, as Ken Petroleum noted in the opinion, CP Well works with multiple operators under multiple contracts and has its own risks and liabilities. CP Well, as a responsible operator, responsible contractor, gets the insurance that under its own assessments, CP Well needs to manage its risk. Well, what do you say to his closing argument, which was that if the minimum is the maximum and the shoe were on the other foot and CP Well were suing Cimerex for indemnity, then CP Well would be entitled to no more than $3 million under the knock-for-knock idea. I would say that that is what the contracts provide, right? We are interpreting contracts. Well, aren't a lot of contractors in the oil patch a lot smaller than CP Well? I don't have a great answer for that, Your Honor. I suspect there are some that are much bigger and some that are much smaller. There are lots that are smaller, yes. Yes, Your Honor. Did CP Well negotiate the provision in the insurance policy that limits the indemnity obligation to the $3 million minimum in the MSA? CP Well selected the insurance policy by choosing to purchase the insurance policy at issue in this case, yes. Is that a standard policy provision, or did they negotiate it with the insurance company? It is a provision that is afforded in this particular insurance policy. It is not in every insurance policy. It's not in every insurance policy issued by AIG. It is not in every insurance policy issued generally. It is in this policy. It's not, however, unique to this case because, as is the case with contracting parties, it is the same with contracting parties with their insurance carriers. There is an effort to meet the requirements of contracts. There is a $3 million requirement, and there is an effort to protect the remaining limits for other operations, other contracts, and for CP Well's own liabilities. I was going to ask that question, maybe a boneheaded question, but I was going to ask what was the other insurance for, but I think you answered it. Exactly, Your Honor. This umbrella policy provides excess coverage for a number of different underlying coverages, not just indemnity coverages, auto coverages, general liability coverages, employee benefit coverages, stopgap employment liability coverages. Is there anything in the MSA or in Texas law, and forgive me, I'm a Mississippi boy, but is there anything in the policy or in the MSA or Texas law that says that CP Well would have to take out like a different insurance policy? In other words, that this policy could only relate to the indemnity obligation in the MSA? Does that make sense? Yes. There is nothing in the statute, the law, or the MSA that would require a risk-specific insurance policy, and this is not a risk-specific insurance policy designed just for this indemnity obligation. Is there another layer of insurance above this one? No, Your Honor. So is it not correct that if the limit of this policy is $3 million, that CIMREX could sue CP for the balance due under the indemnity agreement? No, Your Honor. The indemnity agreement is independent of the insurance agreement. Well, under Gandy, it is true that indemnity agreements and insurance agreements can be, and if so drafted, are separate, but under the Texas Oilfield Anti-Indemnity Act, you cannot fully separate the insurance from the indemnity or else they are voided. You must evaluate both the insurance and the indemnity together to create an enforceable obligation between oil and gas companies. And in this case, that's precisely why we evaluate the insurance policy to start with. We have to look at the insurance policy to see what agreement CP Well made for the benefit of CIMREX. Well, I have to say I found it almost disingenuous in your briefing that you kept interpolating or adding indemnity to cases like Deepwater Horizon and Ironshore that clearly referred only to and forest oil that were totally dealing with other assured clauses. You're assuming your conclusion in a way that did not conform to what the cases were about. Well, Your Honor, the arguments made in our brief were to, I suppose, because there is such a close connection in the oil and gas industry, which both Deepwater Horizon and Ironshore evaluate both additional insured coverage and MSAs in an oil and gas agreement. I think the cases are, at a minimum, analogous to the circumstance before the court. There is definitely a parallel, an intentional parallel, between the coverage to be afforded to a party like CIMREX and the indemnity. Well, does one clause render the other superfluous? They can't be totally parallel. Well, they can be parallel, and they don't necessarily have to be superfluous. They are sometimes referred to as belts and suspenders, right? You have an ability to have insurance for a company like AIG, and you have an ability to get indemnity from a company like CP Well. They are complementary, they are parallel, and they are analogous when interpreting the intentions behind the parties and the interplay between those two contracts. For that reason, we have explored the ability from the Texas Supreme Court in Deepwater Horizon and the Fifth Circuit in Ironshore to evaluate both contracts to the extent they refer to each other, which they do. And specifically, when looking at an indemnity agreement, the Texas Oilfield Anti-Indemnity Act requires us to do that. Chem Petroleum is a case that looked at a specific part of 127.005B, which was the dollar limits, the part of insurance the parties agreed to provide. A corollary to that exact same provision is that the court is to look at the extent of coverage and the dollar limits of insurance. The extent of coverage was not evaluated in Chem Petroleum. It wasn't before the court. That specific point was noted by Ranger Insurance versus American International Specialty Lines Insurance Company, a Houston court of appeals case subsequent to Chem Petroleum. The extent of coverage invites, by statute, an evaluation of the insurance policy, as was done by the district court in this case. But you go back to the MSA, and it still says at least. It does say at least. And CP Well got $3 million, which was the requirement. At least does not change the requirement. If you're looking for evidence of agreement, which is what's required by the statute, evidence of agreement, not circumstance or coincidence, it is certainly fortuitous that CP Well was astute enough to get $11 million in total coverage for its liabilities. That does not mean that they agreed to furnish Cimerex $11 million or $100 million of insurance for Cimerex's operations. It is within. Well, they would have been a maximum of $11 million under the coverages, I believe. Yes, under the facts of this case. Because Cimerex had $26 million. Correct. Yes, absolutely. They would be limited to the $11 million that CP Well actually provided. But my point is there's nothing in the agreement that says 11 or 100 or 26. It says 3, and that is what was required and what CP Well actually provided. And if you're looking for what is evidence of an agreement, you have to look at what the parties mutually understood. That is basic contract law. What the parties mutually understood is that CP Well was required to get $3 million of liability insurance to support an indemnity to Cimerex. But do you go to CP Well's policy to do that? You go to CP Well's policy. You can go to CP Well's policy. But how is that evidence of mutual intent or agreement? Well, it's evidence of what CP Well intended to furnish Cimerex. Okay, but how is that mutual? Isn't that what we're after here, what the parties mutually agreed to or mutually intended by that language? Absolutely. That is what you're looking at. But since only one party is soliciting indemnity, you need to look at what CP Well agreed to furnish. Let's see, that's where you're conflating, it seems to me, other assured and indemnity clauses. Because obviously, I mean, the whole point of Deepwater Horizon, as I read it, is that you look at when you're talking about an other assured clause, you look first at the policy because you're suing the insurance company. So you look, what does the policy say? And when the policy says, you know, liability is described by the contract, then you go back to the party's contract to determine if there are amounts specified in the contract. Whereas here, you look first at the obligations of the contract and the need, as you agree, for mutual agreement. So we are within the bounds of paragraph 11.10, possibly supplemented by Exhibit C1. Correct. I would say that the party is similar to Deepwater Horizon, in which the court noted that the contracts refer to one another. And so in some capacities, the contracts policy agreement may be. But your insurance policies were not incorporated or referenced or in any way made part of the MSA. It was merely the obligation to purchase insurance in required amounts. And if you didn't do that, you would be in breach and then, as I read Graywolf, you would still be liable for the $11 million. Because that's what you had, and under NOC for NOC, that's the way it would work. So the MSA does specifically refer to the types of insurance in 11.10, the types of insurance and the dollar limits required. Specifically, the Texas Oilfield Anti-Indemnity Act refers to the extent of coverage, those are exact words, and the dollar limits. The provisions that have been referred to this court are the limits of liability section. They are not exclusions. This court did not undertake a coverage analysis to see whether, in fact, the contractual liabilities of CP Well were covered. What the court did was determine the extent of coverage as determined by the limits of liability section of the policy. The numbers on the declarations page by themselves are largely meaningless without understanding the extent of coverage that's afforded, and that is determined by the limits of liability section. That's what was provided to the court. Let's say that you were required to purchase your minimum of $3 million, and you purchased a base policy that had $1 million and then an excess policy that had $2 million subject to any, well, and it said, you know, except for some kind of blowout. And then a blowout occurs, and they call on you for indemnity, and your policy excludes blowout. You would be in violation of the MSA, right? I'm bad at hypotheticals. Well, if $3 million of indemnity under your hypothetical was not afforded, that would be a breach of the agreement, yes. Correct. And if your excess policy here kicks out before it's supposed to under the MSA, excludes coverage before it's supposed to under the MSA, then you're in breach. Well, Your Honor, I would suggest the issue before the court is under the limits of liability section of the policy. The question of whether the court can or should evaluate the coverage as a whole is not before the court, and it's not what's been articulated or argued by my client. So I don't think evaluating exclusions to the policy has been the position my client has taken as an appropriate exercise. I would note, however, that Ken Petroleum and Ranger Insurance both remanded the issue of what was actually agreed to between the parties as to the extent of coverage and dollar limits of the party back to the trial court because there was not sufficient evidence. There were certificates, but there was an open question as to what was agreed to by the parties. In Ranger Insurance, there were policies, but there was a question, a fact question that was not resolved at the appellate level on the issue. This fact question, as proffered by my client, was resolved by the limits of liability section as evidence of its intent and what it agreed to furnish for CIMRACs in this case. Thank you, Your Honor. In Ken Petroleum, the Supreme Court rendered, in the Weber matter, what the limits were. Well, they didn't on one of them. Well, on the Ken Petroleum part, they remanded, but they remanded on the DTPA claim. No, well, then I'm thinking of one of the other claims that the parties had where it had to do with a certificate of insurance, and one side said they furnished us such and such a certificate, and we thought that was the coverage, and the court remanded. Yeah, that's the fact issue on whether that was provided. I agree. I think that's what she was alluding to. Okay. I didn't know that. That was not Ken Petroleum, but if I may, the parties agreed to an unspecified amount of liability insurance. Was CIMRACs ever aware of, I'm sorry to interrupt, Counsel. This just hits me. Was CIMRACs ever aware of the amount of coverage that CP Well had obtained? In other words, did CIMRACs have the policy, I'm talking about pre-claim, pre-suit, pre-accident even, any time when the MSA was in its infancy? I don't believe the record explains that or answers that question, but that's a really good question, Judge Wilson, because if CP Well's position is agreed to or becomes the law,  Well, no, parties will know how to contract in a way to specify what protection they really want as opposed to a minimum floor, which is what you contracted for here. Well, yes, but we also agreed and contracted that we could agree more, and not all policies. I mean, there would be a lot of agreements that have the minimum language, but we didn't find out. Well, I don't know, again, I can't say that. The record doesn't answer your question, but in many cases you're not going to find out about what the limits are until after the accident, the event, and then it's too late. But is that the case of the dog that didn't bark? In other words, if it really is the $11 million aggregate coverage, if that policy was provided in advance, well, CMRX would clearly have known that by the limitations in that section E, it was $3 million, it was the floor. Well, I don't know if they were provided, but I do want to get back to Judge Jones's question about subsection E. And if the court does go into and look at E, we say look at the MSA, and that's all you have to do in Kim Petroleum. If the limits are not stated and firm, then you look to what was obtained, and that sets the mutual agreement out. So that's our position. But in E, it's very important that the language in E, we don't shy away from it. The court doesn't need to go there. But here, okay. The most we'll pay for damages under this policy on behalf of any person or organization to whom you are obligated by contract to provide insurance such as afforded by this policy is the lesser amounts of the deck or the amounts agreed to in the written contract. What that means is to provide insurance such as is afforded by this policy, that's the obligation in the MSA to name the other party as an additional insured to provide insurance to that party. And they did by naming us as an additional insured. Now, if we were to sue as an additional insured, then E says that the most we could get would be the minimum of limits, and that talks about the minimum of limits. But in terms of indemnity obligations, Your Honor, in the cases, you look to what they obtained. But if CIMMEREX never saw the policy provisions before the accident, then the best CIMMEREX could assume is that they would have gotten the minimum amount of coverage, right? Well, if they looked at the policy and looked at E. No, no, I'm talking about if you didn't look at the policy, and we don't know when CIMMEREX ever saw the policy for the first time, the best thing you could assume under the MSA is that C.P. Will had $3 million in coverage. Well, you would look at, I think they would have knowledge of the limits. I'm not saying that they weren't aware of the amount of insurance in looking at the page. I mean, that's why we have the, you look at the umbrella policy, limits of insurance, 10 million per each occurrence, 10 million aggregate. But E says the minimum limits of insurance you agreed to procure, and the minimum limits was $3 million. If they were under the circumstance of Section E, Your Honor, but were not, because that deals with an A.I., additional insured claim, which, as the court has acknowledged and knows very well, that's a separate and distinct and independent obligation. It doesn't say additional insured. It just says any contract to provide insurance. Such as afforded by the policy. Well, they didn't provide insurance to us. C.P. Will obtained insurance for itself to cover itself for contractual liability. It provided insurance to CIMBRAX as an additional insurer so we could, see my time's out, go directly if we wanted to. Well, I'm sorry, I don't remember what the policy says. Is there an other insured clause? Does it say other, this is in the other insured clause? In the policy? Yes. Yeah, there is other insured. Is E clearly? Any person other than the named insured is an additional insured. It's under the heading, Chief Judge Owen, of limits of insurance, but that's why we have A in the Exhibit 3, because it talks about the dex to the insureds, and then it has E. So it's explained in there, but again, if you look at the definition of additional insured, it's C.P. Will is an additional insured because of what the MSA says. But I don't see that E is standing alone limited to other insurance claims. In other words, I don't see that E is limited to the other insurance clause. I think the language, we're just looking at the language, Your Honor, to whom you are obligated by the insured contract, the MSA, to provide insurance as is afforded by this policy. So you're saying that excludes Texas Oilfield Indemnity Act liability. Yes. It's not talking about that. It's a separate claim as Deepwater, as gilbanged by this court, the AI claim was separate from the indemnity obligations in those cases. I agree they're different claims. No question about that. I'm just questioning whether this specific language limits it to an additional insured context. I think because it's limited to the insurance that you provide to somebody. Well, you have to look at the definition of insured contract, which I don't know whether you have that in your ‑‑ Yes. Means that part of any contract pertaining to your business under which any insured assumes the tort liability of another party. Yes. Well, does that include just the other assured or the indemnity as well? Well, that includes the additional insured can only recover the minimum. Point me to the policy language that provides coverage for the indemnity. Well, it would be the insuring agreement that talks about that. I want the specific language. Yes, sir. Is this record next, sir? Six. I don't know. If you go to contractual liability, it's on record 682, record excerpt 6, but it's record on appeal 682, contractual liability. It says this insurance is not applied for which the insurer is obligated to pay his damages by reason of the assumption of liability in a contract or agreement that this exclusion does not apply for damages assumed in an insured contract provided that a bodily injury, et cetera, occurs after the contract and includes reasonable attorney's fees. And then you go back to the definition of insured contract on 696. Yes. We understand that language. We don't get to this, but even if we do, Your Honor, I think the language in insured contract, yes, the MSA is an insured contract. All the parties agree. All right? I just wanted to see the language. Okay. Yes. There's a language here. Okay. Any other questions? Thank you, counsel. Thank you for hearing our case today. Okay. Thank you.  That will conclude today's arguments. All the cases heard this week are under submission. The court is adjourned. Thank you.